Albin Johnson v. Commissioner. George Johnson v. Commissioner. John August Johnson v. Commissioner. Huldah M. Johnson v. Commissioner. Ellen M. Johnson v. Commissioner.
Johnson v. Commissioner
Docket Nos. 5856, 5857, 5876, 5877, 5878.
United States Tax Court
1947 Tax Ct. Memo LEXIS 278; 6 T.C.M. (CCH) 255; T.C.M. (RIA) 47057; March 6, 1947
*278 1. Petitioners' construction partnership kept its books on a completed contract accrual basis. Held, that under the method of accounting employed, an item of $5,200, the liability to which was not contested by the obligor, was properly accrued as income in 1935 and, accordingly, was not income taxable to the partnership in 1941. Held, further, that an item of $14,600, the liability to which was denied by the obligor and continuously in litigation until 1941, was not an item properly accruable as income in 1935, and therefore the partnership is not entitled to a bad debt deduction in that amount for 1941. 2. Where one of the petitioners, a partner in the Washington state construction partnership, was married in March 1941, held, that his share of partnership income for the entire year, although attributable principally to his skill, experience, ability, and services as a contractor, may not be treated as community income in its entirety. The income allocable to the period prior to marriage is his separate income, and that attributable to the period subsequent thereto is community income, except for an amount representing a reasonable return on capital borrowed on his separate credit *279 prior to marriage. Ralph B. Potts, Esq., 1702 Hoge Bldg., Seattle 4, Wash., for the petitioners. Wilford H. Payne, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: These consolidated proceedings involve income tax deficiencies for the calendar year 1941 as follows: Albin Johnson
$20,070.10
George Johnson
2,007.49
John August Johnson
1,982.82
Huldah M. Johnson
2,007.49
Ellen M. Johnson
1,982.82
All the petitioners are residents of the State of Washington and filed their income tax returns for 1941 with the collector of internal revenue for the district of Washington. Huldah is the wife of George Johnson, and Ellen is the wife of John August Johnson. Their cases are here solely because of their community property status with their husbands. Where the term "petitioners" hereinafter appears, it will refer only to the Johnson brothers, Albin, George, and John August. The respondent has conceded that the petitioners are entitled to deductions for certain business, traveling, and entertainment expenses in the amounts claimed by them and that petitioner Albin Johnson is entitled to deduct Washington *280 sales tax in the amount he claimed. Three issues remain for decision. They are: (1) whether the petitioners' partnership is entitled to a deduction in the amount of $14,600, charged off on the partnership books in 1941 as an uncollectible account and constituting a portion of $19,800 withheld by the Government as liquidated damages in connection with a construction contract completed by the petitioners' partnership in 1935; (2) Whether the remaining $5,200 of the liquidated damages withheld, which amount the Government conceded was due to the petitioners, constituted income to the partnership in 1941; (3) The determination of what amount of petitioner Albin Johnson's 1941 income constituted his separate income, if any, and what portion constituted the community income of himself and his wife. Issues 1 and 2 Findings of Fact Prior to 1934 George and John August Johnson had been engaged in partnership in the construction business for a great many years. In 1934 Albin Johnson was admitted to the partnership under an oral agreement making him an equal partner with his two brothers. Albin contributed $6,000 to the partnership capital. The partnership operated under the name *281 Western Construction Company, with offices in Seattle, Washington. On March 17, 1934, at or about the time Albin was taken into the partnership, the Western Construction Company obtained a contract with the United States Government for the construction of piers for the Grand Coulee Bridge over the Columbia River in Washington, for an estimated consideration of $180,177.40, subject to adjustment for variations. The contract called for completion within 200 days and provided that for each day of delay the contractor should pay the Government $100 as liquidated damages except that the contractor should not be charged damages for delays due to unforeseeable causes without fault of the contractor, such as acts of God, of the public enemy, of Government, etc. It was further provided that. - Whatever sums may be due as liquidated damages for delay may be deducted from payments due to the contractor or may be collected from the contractor or the contractor's surety or sureties. The contract was completed and accepted in May 1935, 198 days late, and the Government deducted and withheld $19,800 as liquidated damages for the delay. The partnership books were kept on a completed contract *282 accrual basis. In 1935 the full amount of the contract, including $19,800 deducted or withheld by the Government, was accrued on the partnership books and reported as income in the partnership return. The return, however, showed a net loss for the partnership of about $37,000. The partnership suffered a large loss in connection with the Grand Coulee bridge contract and in June and September of 1935 filed formal claims with the government contracting officer and the Interior Department for the remission of the liquidated damages deducted by the Government, and also for the actual loss sustained on the contract. The total claims aggregated $146,166.40. The grounds asserted in support of the claims were delays due to high water, the inexperienced labor obtained from the National Recmployment Service, and arbitrary and unreasonable interference by the government inspectors. The claims in excess of the $19,800 liquidated damages were not accrued on the partnership books or reported as income in the 1935 return. On October 29, 1935, the government contracting officer ruled that 52 days' delay had been justified on account of high water and strikes and held that $5,200 of the total liquidated *283 damages deducted by the Government should be remitted to the contractor. All the other claims presented by the petitioners were rejected. The petitioners appealed to the Secretary of the Interior who, on May 21, 1936, affirmed the decision of the contracting officer in every respect. The $5,200 which the contracting officer ruled should be remitted to the petitioners was not then paid and, until the hearing in the instant proceeding, had not been paid. From 1936 to 1940 the Western Construction Company partnership did not actively engage in the construction business. It was not dissolved, however, but was kept alive for the purpose of paying off creditors on the Grand Coulee bridge project and for prosecuting its claims, against the Government. Annual partnership returns continued to be filed. On the advice of petitioners' bankers, a corporation was organized by the petitioners in October 1935 under the name Western Construction Company, Inc., and the construction work during the years 1936 to 1940 was conducted by the corporation. After the adverse ruling by the Secretary of the Interior, petitioners instituted suit in the United States Court of Claims seeking to recover on *284 the claims which they had presented to the contracting officer and to the Secretary of the Interior. Included in the amount sued for was a claim for the $19,800 deducted and withheld by the Government as liquidated damages. The Court of Claims rendered its decision on April 7, 1941, sustaining in its entirety the action of the administrative officers and holding that the petitioners should recover only the $5,200 which the contracting officer and the Secretary had held should be remitted to the contrator and which the Government, in the Court of Claims, had conceded was due them. Petitioners thereafter charged off on the partnership books $14,600 to profit and loss and in the partnership return for 1941 claimed a bad debt deduction in that amount. Respondent disallowed the claimed deduction and, in addition, held that the $5,200 item constituted taxable income to the partnership in 1941. Opinion Petitioners kept their partnership books on the completed contract basis, which is a modified accrual method of accounting whereunder income and expenses on a construction contract are accrued and the profit or loss accounted for in the year when the contract is completed. If the petitioners *285 had not accrued $14,600 as income in 1935, there would be no basis for claiming a bad debt loss in 1941. Cf. . But they did accrue the full amount of $19,800 deducted and withheld by the Government as liquidated damages. The decision of these two issues, therefore, depends upon whether all or any part of that amount was a proper accrual in 1935. In the case of an accrual basis taxpayer, it is the right to receive income and not the accrual receipts that determines the inclusion of an amount in gross income. . But income does not accrue to a taxpayer until there arises to him a fixed or unconditional right to receive it. ; cf. . Where there is a genuine contingency as to the existence of legal liability of the payor to the taxpayer, in other words, where the payor denies the liability and is contesting the taxpayer's claim, the taxpayer may not properly accrue the item as income. ; *286 ; ; ; aff'd, ; and . Applying the rules of the preceding cases to the facts here present, we see that in the partnership's taxable year 1935 the Government definitely denied its liability to pay to the petitioners $14,600 of the amount which it deducted or withheld as liquidated damages, and that its liability to that extent remained continuously in contest until the Court of Claims' decision was rendered in 1941. On the other hand, in October 1935 the government contracting officer admitted that the petitioners were entitled to $5,200 of the amount of damages withheld; and on this record it appears that at no time since October 1935 has the Government contested its liability to pay that amount. It matters not that the petitioners did not acquiesce in the rulings of the government contracting officer but chose to prosecute their total claims, including all the liquidated damages withheld, through to a final determination *287 by the Court of Claims. The important factor is that since prior to the close of the partnership's taxable year 1935, the $5,200 has not been a disputed or contested item. The Government in the Court of Claims conceded its liability to that extent, based on the prior rulings of the administrative officers. We hold, therefore, that the $14,600 was not properly accruable in 1935 but that the $5,200 was. It follows that the claimed bad debt deduction of $14,600 in 1941 was correctly disallowed. See ; aff'd, ; cf. However, the $5,200 was income to the partnership, not in 1941, but in 1935 when it was accrued and treated as such by the partnership. Issue 3 Findings of Fact In October 1940 the petitioners' partnership, Western Construction Company (hereinafter referred to as "Western"), entered into a joint venture agreement with petitioners' brother-in-law, E. R. Erickson, doing business as West Coast Construction Company (hereinafter referred to as "West Coast"), for the purpose of bidding on the construction of the Westpark housing project *288 at Bremerton, Washington. Under the terms of the agreement, profits were to be shared equally by the two concerns. The contract, known as Washington 3-1, was awarded to the joint venture on December 3, 1940, for a consideration of $1,812,300, and work thereon began December 11. The contract called for the construction of 825 houses, together with related buildings and facilities. Petitioners borrowed about $75,000 from a Seattle bank in December 1940 on notes signed by George, John August, and Albin. This money, together with money put up by West Coast, was deposited in a trust fund under a trust agreement with the contractors' surety company to be used as working capital for the housing project. The fund was subject to the joint control of the contractors and the surety. John August and Albin Johnson, on behalf of Western, and Erickson, on behalf of West Coast, worked at the site of the housing project, actively supervising construction. George Johnson devoted some of his time in the taxable year to the affairs of Western but spent the greater part of his time in connection with the affairs of the corporation, Western Construction Company, Inc. In January 1941, the joint venture *289 agreement was modified to provide that Western's share should be 60 per cent and West Coast's share should be 40 per cent, and it was further provided that: ALBIN JOHNSON shall draw a salary of One Thousand ($1,000.00) Dollars per month as Chief Superintendent of Construction, said salary to begin as of December 1st, 1940, and shall continue until the work is substantially finished, provided, however that E. R. Erickson, shall determine the date when the services of ALBIN JOHNSON are no longer required, and in the event that ALBIN JOHNSON should be ill, or for any reason be unable to perform his duties, pro rata deductions shall be made from his salary for such lost time. Both modified provisions were adopted to increase Western's share in the profits, in view of the fact that two supervisors on the project were provided by it, whereas West Coast furnished only one. The socalled "salary" for Albin mentioned in the modified agreement was never paid to or received by him but was intended merely as an offsetting payment to Western and was paid to Western as a part of its share in the joint venture profits and divided equally among the partners in Western. On March 3, 1941, a further *290 contract, known as Washington 45043, was awarded to the joint venture for construction of 240 additional housing units at Westpark, the consideration being $685,758. Petitioners borrowed an additional $30,000 from the bank to assist in financing this contract. Both the principal and supplemental contract were treated as a unit, and the costs and profits were not segregated on the joint venture books as between the two contracts. Monthly payments were made by the Government to the joint venture as the work progressed. These payments were based on estimates submitted by the contractors as to the percentage of work completed at the end of each month. The estimates were approved by a government engineer on the project, after a visual inspection of the work in progress. On December 31, 1940, Albin Johnson's capital account on the books of Western showed a deficit amount of $8,762.17. On March 8, 1941, Albin Johnson married Rose Chapman. At the time of his marriage, approximately one-third of the work on the principal contract had been completed. Work on the second contract was commenced at about the time of his marriage. By the end of June 1941, work under the principal contract *291 was about 97 per cent completed, but further work was required under the supplemental contract and landscaping on the entire project continued until about the end of the year. Albin worked at the site through the month of August, and John August worked several months longer. In the course of the construction Erickson died, and after his death an additional offsetting payment of $1,000 a month was made to Western inasmuch as John August was actively supervising construction work on the project. Both contracts were substantially completed in 1941 and the joint venture received the gross amount of $1,856,536.05 on the principal contract and $703,211.33 on the supplemental contract. These amounts included sums paid on account of change orders. The joint venture realized a profit of $326,212.78, and of this amount Western received as its share $202,527.67, all of which was taken into the income of Western for the taxable year 1941. The latter sum consisted of $185,527.67 as its 60 per cent share of the net joint venture profits under the agreement, plus $9,000 as additional offsetting payments because of Albin's services on the project, and $8,000 as additional offsetting payments for *292 John August's services there after Erickson's death. While some capital was employed in the business, the knowledge, experience, ability, and services of the partners were the principal factors in the production of the partnership income of Western. Practically all the gross income of Western consisted of its share of the profits from the joint venture. The services and skill of Albin Johnson were an important element in reducing construction costs on the project and enabling the realization of a greater profit. There was no antenuptial contract between Albin Johnson and his wife to convert their separate property into community property upon their marriage. During the taxable year 1941 the corporation, Western Construction Company, Inc., in which the petitioners held stock in equal proportion, was also actively engaged in construction work, completing contracts obtained by it prior to the Westpark housing project. Each of the Johnson brothers received a salary of $9,000 from the corporation in 1941. Albin's salary of $9,000 from the corporation was divided between his and his wife's returns in the respective proportions of $5,250 and $3,750, and the respondent has not disturbed *293 this allocation. Albin's distributive share of partnership income as reported in the partnership return of Western was $59,357.08 which was divided equally by Albin and his wife in their individual returns, $29,678.54 to each. Of the $202,527.67 received by Western as its share of profits from the joint venture, the amount of $146,892.32 is allocable to the principal contract. Of the latter amount, one-third, or $48,964.11, is allocable to the period prior to March 8, 1941, the principal contract having been one-third completed by that date. In the same proportion (48,964.11/202,527.67) Albin Johnson's adjusted distributive share of partnership income, $64,257.08, is allocable $15,535.11 to the period prior to his marriage on March 8, 1941, and $48,721.97 to the subsequent period. The $15,535.11 constitutes his separate income. Of the $48,721.97 allocable to the period after marriage, $2,331 represents a reasonable return on Albin's share of the borrowed capital and is likewise his separate income. The balance of $46,390.97 is attributable to community effort and constitutes the community income of Albin and his wife. In summary, $17,866.11 of Albin's distributive share of partnership *294 income is his separate income, taxable to him alone, and the remaining $46,390.97 is community income, taxable one-half to him and one-half to his wife. Opinion Petitioner Albin Johnson and his wife reported Albin's entire share of partnership income for the whole year as community income, notwithstanding that they were married on March 8, 1941. To justify such action petitioner here attempts to establish an antenuptial contract between himself and wife to convert their separate property into community property. In support of that claim petitioner introduced several letters which passed between himself and his wife which passed between himself and his wife prior to their marriage, and both he and his wife gave some testimony with reference to the letters. In none of the letters, however, can we find any definite offer or acceptance or any evidence of an intent to make an offer to settle property rights as an inducement to marriage. Nor does the testimony in this connection lay any foundation to support a holding that there was a valid contract to convert separate into community property. We think this contention of the petitioner therefore is without merit. Thus it becomes necessary, *295 in the absence of such a contract (and we express no opinion here whether a valid contract, if there had been one, would support a division of the income for the entire year), to determine what proportion of Albin's distributive share of partnership income constitutes his separate income and what proportion is the income of the community. Respondent relies on the rule that a "salary" is to be taken as the only portion of partnership income attributable to personal services in any case where partners in an arm's length agreement provide for salaries to one or more partners for services, and the salaries are first deducted, with the remainder of the net profits being divided among all the partners in proportion to their capital interests. See . Accordingly, respondent has allowed only $6,000 (denominated as "salary" in the deficiency notice) as the community portion of Albin's partnership income and has held that the rest constitutes Albin's separate income. Apparently the Commissioner made his determination in the belief that Albin received $6,000 under the joint venture agreement from March through August 1941. The facts are, however, *296 that Albin did not receive $6,000 as salary from the joint venture, nor did he receive that or any other amount qua salary from the partnership. The provisions in the joint venture agreement relating to so-called "salary" for Albin were nothing more than an offsetting payment designed to effect a more equitable adjustment of Western's share of profits from the joint venture in view of the fact that Western provided two supervisors, whereas West Coast provided only one. It was included as a part of the share of profits received by Western from the joint venture and divided equally among the petitioners. The partners in Western had no agreement with respect to the payment of salaries to any partner, and none of them drew any salary. No amounts were deducted as salaries of partners in determining partnership net profits. All the partners were active in the partnership business, rendering personal services. The net profits were divided among them in accordance with their partnership interests. Therefore, the rule contended for by the respondent is not applicable to the facts now before us. Respondent next contends in support of his action that Albin's partnership interest and his interest *297 as a partner in the construction contracts constituted "pecuniary rights" which were the separate property of Albin at the time of his marriage, and that the rents, issues, and profits flowing therefrom remain his separate property. It is undoubtedly the law of Washington that property and pecuniary rights belonging to a person at the time of marriage remain, with certain exceptions, his separate property; and the rents, issues, and profits thereof are likewise separate property. Rem. Rev. Stats. Wash. Ann., sec. 6890; . However, neither Albin's partnership interest nor the construction contracts were property or pecuniary rights which, by themselves and unattended, were inherently capable of producing "rents, issues, and profits". The knowledge, experience, abilities, and personal care and attention of the partners were required to develop the rights and produce the income; and, on the basis of the evidence, we think that these elements were of far greater importance in the production of income than were any property rights or interests. Coming from a married man, these elements constitute a community contribution. Albin *298 Johnson, however, was not married until March 8, 1941, and therefore so much of his income as is properly allocable to the period prior to his marriage is his separate income. We do not find here a factual situation such as to give rise to the application of the "commingling rule" urged by petitioner in support of his contention that all the income is community. , primarily relied upon by petitioner, dealt with the commingling of separate funds with community funds over a great many years and involved quite different facts. In (No. 161, Dec. 26, 1946), we considered a number of Washington decisions, some of which are also cited by the petitioner here, and pointed out the distinction between situations where the commingling rule applies and those where it does not. Accordingly, we conclude that an allocation should be made between the period prior to Albin Johnson's marriage and the period subsequent thereto. It may well be, as petitioner contends, that he did not know at the date of his marriage whether the construction contracts would eventually result in profit or loss. *299 Nevertheless, the contracts were completed within the taxable year, and the fact is that they did result in substantial profit. And since a part of the work on the principal contract was performed prior to March 8, a portion of this profit is properly allocable to the period prior to that date even though, under the accounting system employed by the partnership, none of the profit was taken up into its income until completion of the contracts in the latter part of the taxable year. Inasmuch as practically all the income of Western consisted of its share of the profits from the joint venture, Albin Johnson's distributive share of partnership income is allocable to the period prior to his marriage on March 8 in the same ratio that the profits of Western from the construction contracts is allocable to that period. We have found from the evidence that approximately one-third of the work on the principal contract was completed by March 8. In so finding, we have given consideration, inter alia, to the monthly estimates submitted to the Government in order to obtain payments as the work progressed, based on the percentage of completion of work at the end of each month. Petitioner contends *300 that these estimates were "unbalanced" in the early months, but the evidence shows that they were approved by the government engineers on the project after visual inspection of the work in progress. We think, therefore, that the estimates are not without weight. No segregation of profits was made on the books as between the principal and the supplemental contracts, and in the absence of such segregation we have determined the amount of Western's profits allocable to the principal contract based on the ratio of the gross receipts on that contract to the total gross receipts on both contracts. One-third of the amount so determined is thus the portion of Western's profit allocable to the period prior to March 8. The ratio of that portion to Western's total profit from the joint venture is then the measure of the portion of Albin Johnson's distributive share of partnership income which is allocable to the period prior to his marriage and which is accordingly his separate income in its entirety. The evidence, we think, demonstrates that community effort was by far the principal factor contributing to the production of the remaining portion of his partnership income allocable to the *301 period after his marriage. In , after discussing leading Washington decisions, we said: As we understand these decisions of the Supreme Court of Washington, they lay down the rule that where business income was produced in part by the separate property and in part by the efforts of the community, and each of these two factors was substantial, the court will attempt to allocate such earnings; but if it appears that the income is to be attributed primarily to one element, the other element may be disregarded. Being mindful, however, of the fact that some capital was employed in the business and that a substantial amount of money was borrowed on Albin's separate credit, we do not think that this element may properly be disregarded entirely. We have accordingly determined what amount would be a reasonable return on Albin's share of the borrowed capital, which, of course, is also his separate income; and, after deducting this amount, the balance is community income divisible between Albin and his wife. Since new computations must be made in order to give effect to the concessions of the respondent and to our rulings on the issues *302 raised, Decisions will be entered under Rule 50.